# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-2590

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS,

*Plaintiff-Appellant,*

*v.*

CSX TRANSPORTATION, INC. AND BROTHERHOOD
OF RAILROAD SIGNALMEN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 5292—**Robert W. Gettleman**, *Judge.*

ARGUED NOVEMBER 8, 2005—DECIDED MAY 4, 2006

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

CUDAHY, *Circuit Judge.* This case asks us to determine whether an arbitration proceeding touching on the interests of at least three parties but directly involving only two violates either the Railway Labor Standards Act (RLA), 45 U.S.C. §§ 151-164 (2006), or basic notions of procedural due process or both. We conclude that the plain language of the RLA contemplates public law boards comprised of only two partisan members and a neutral arbitrator with other interested parties participating as advocates at the hearings. We also conclude that this participation structure is

sufficient to satisfy the requirements of due process. Accordingly, we affirm the judgment of the district court.

The underlying dispute in this case centers on which categories of railroad employees should perform the work of repairing signal systems. Railroads, including CSX Transportation, Inc. (CSXT), have traditionally assigned this type of work to signalmen. The work required to perform the repairs, however, began to implicate a number of specialities as technology evolved. Signals today involve rather sophisticated electronics, and some railroads, including CSXT, now assign the work to communications employees. Since both categories of workers have relevant expertise, it is unclear which is better suited to perform the maintenance. And it is inevitable that, regardless of which category of worker the railroad chooses, another category will object.

The work dispute here involves the choice of a single employee. CSXT assigned work related to removing and installing a data radio near Roanoke, Alabama, to an electrician represented by the International Brotherhood of Electrical Workers (IBEW). The Brotherhood of Railroad Signalmen (BRS) objected to this assignment, contending that under its collective bargaining agreement, CSXT may assign this work only to a signalman. CSXT asserted that it was free to assign this work either to a signalman or to an electrician. BRS and CSXT could not resolve this dispute and agreed to present it to Public Law Board 6525 (the Board), a special board of adjustment they had previously established to resolve disputes arising between them.

Neither CSXT nor BRS notified IBEW that this dispute was before the Board. Pursuant to the RLA, CSXT and BRS selected arbitrator M. David Vaughn as the chair and neutral third member of the Board. Vaughn notified IBEW of the dispute on March 4, 2004, and invited IBEW

to submit its position on the issue and attend the hearing as a third-party. IBEW objected to the proceedings on the ground that the Board had no jurisdiction to interpret IBEW's collective bargaining agreement because IBEW was not a party to the arbitration. Vaughn rejected these objections and notified the parties that he intended to go forward with IBEW participating as an interested third-party. IBEW participated in the hearing but was not represented on the Board and maintained its objections.

On April 30, 2004, Vaughn sent his signed proposed award to CSXT, BRS and IBEW, which became final on May 10, 2004. This award sustained BRS's position and rejected the arguments of IBEW and CSXT. Specifically, Vaughn concluded that the collective bargaining agreement required CSXT to assign the work to a signalman. He accordingly rejected CSXT's argument that it had discretion to assign the work as it saw fit and IBEW's that the work was within the province of an electrician. IBEW now appeals.

We review orders granting summary judgment de novo. *Lyons v. Norfolk & W. Ry. Co.*, 163 F.3d 466, 469 (7th Cir. 1999). The findings of the Board, however, will receive an extraordinary amount of deference, since the scope of judicial review of a public law board's decision is among the narrowest known to the law. *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 91 (1978); *Lyons*, 163 F.3d at 469. Although the RLA allows judicial review only in limited circumstances, 45 U.S.C. § 153(q), in this Circuit due process is a ground for reviewing an arbitration award. *Pokuta v. Trans World Airlines, Inc.*, 191 F.3d 834, 839 (7th Cir. 1999).

The RLA recognizes that the transportation industry is critical to the nation's economy and that labor disputes have the power to cripple the economy if strikes result. *See* 45 U.S.C. § 151a. Accordingly, the RLA estab-

lishes a comprehensive framework to control labor relations and resolve labor disputes involving railroads (and airlines). 45 U.S.C. §§ 151, 181. *See* Herbert R. Northrup, *The Railway Labor Act—Time for Repeal?*, 13 HARV. J.L. & PUB. POL'Y 441, 442-55 (1990) (chronicling the history of the Act and explaining its provisions). Section 153, which establishes the National Railroad Adjustment Board (NRAB) and outlines arbitration procedures, is the portion of the statute relevant to this dispute.

Section 153 establishes a system of compulsory arbitration for minor disputes (generally those disputes stemming from the interpretation of collective bargaining agreements) but gives parties a choice of methods to use for this purpose. *United Transp. Union v. Gateway Western Ry. Co.*, 284 F.3d 710, 711 (7th Cir. 2002). One option, set forth in § 153 First, involves arbitration by the NRAB, a bipartisan agency comprised of thirty-four members, half appointed by unions and half by carriers. The parties may also choose to submit to a voluntary (ad hoc) public law board pursuant to § 153 Second, as BRS and CSXT did here.

Work-assignment disputes are fairly common in the context of railroad arbitrations. In general, such disputes involve at least three parties: the railroad, the union to which the railroad has assigned the work and the union that believes it should have been assigned the work. These disputes typically proceed in the manner that this one has, with the union believing it was entitled to the work demanding arbitration of the railroad, and the union selected by the railroad participating as an interested third-party. The RLA deals with arbitrations between unions and carriers, not among unions. Thus, the participatory structure envisioned by the RLA fundamentally requires the disputing union and carrier to participate as partisan members but does not envision partisan membership for other interested unions.

IBEW argues that this participatory structure violates both the text of the RLA and fundamental strictures of due process, both of which require participation in all aspects of the arbitration by all interested parties. But these contentions are misguided. In support of its contentions, IBEW points primarily to an Eighth Circuit case that concluded that all interested parties must participate as partisan members of the arbitration panel. *Bhd. of Locomotive Engrs. Int'l Union v. Union Pac. R.R. Co.*, 134 F.3d 1325 (8th Cir. 1998) (*BLE*). There the Eighth Circuit explicitly noted that its "own reading of the statute [left it] somewhat discomforted by this resolution, because the plain language of the second paragraph of 45 U.S.C. § 153 Second seems to envision only a three-person [public law board]." *Id.* at 1333. IBEW additionally contends that only the NRAB has the power to bind a nonconsenting third-party to an arbitral award. The text of the RLA, however, simply does not support IBEW's arguments.

We initially note that the first paragraph of § 153 Second states that if "either party to such a system, group, or regional board of adjustment is dissatisfied" with the public law board, "it may upon ninety days' notice to the other party elect to come under the jurisdiction of the adjustment board." Congress's use of the word "either" is notable in this context, for it suggests that Congress intended that these boards be bilateral—and nothing more.

But Congress did more in this statute than merely suggest that these boards be bilateral. The third paragraph of § 153 Second plainly states that the public law boards "shall consist of *one* person designated by the carrier and *one* person designated by the representative of the employees." 45 U.S.C. § 153 Second (emphasis added). Parties electing to use § 153 Second will either resolve their grievances through a voluntary board or choose a third-party neutral to mediate their dispute. If they cannot either resolve the dispute or choose a neutral, then the National

Mediation Board will appoint an arbitrator. Nothing in the
statute contemplates more than two partisan board mem-
bers.

IBEW does not focus on the text of § 153 Second but
instead directs its argument toward conformity with a line
of Eighth Circuit cases that is virtually unique to that
Circuit.[1] Although IBEW is correct that *BLE* granted an
interested third-party union full-party status on an arbitra-
tion board, that opinion quite clearly states that Eighth
Circuit precedent—not the RLA—forced this conclusion.
The Eighth Circuit explicitly noted that "[t]he plain lan-
guage of the RLA anticipates a three-member board," *BLE*,
134 F.3d at 1332, but concluded that other cases—cases
that it was not able to overrule—demanded a different
result. Given the Eighth Circuit's discomfort with the *BLE*
line of cases, we see no reason to extend the reach of this
line of authority.[2]

---

[1] No circuit aside from the Eighth Circuit has adopted this
position. IBEW attempts to bolster its position by citing *Hugs &
Kisses, Inc. v. Aguirre*, 220 F.3d 890 (8th Cir. 2000), for the
proposition that arbitration is a voluntary procedure to which
nonconsenting parties cannot be forced to submit. *Hugs & Kisses*
and cases like it, however, are inapposite in the context of
railroads, since the RLA requires parties to submit to arbitra-
tion in certain instances. *Andrews & Louisville & Nashville
R.R.*, 406 U.S. 320, 322 (1972); *United Transp. Union*, 284 F.3d at
711.

[2] Moreover, the Eighth Circuit cases are, as the district court
recognized, factually distinguishable from the present case. The
Eighth Circuit cases involved tripartite disputes implicating
identical contract language in the two collective bargaining
agreements at issue. *BLE*, 134 F.3d at 1332; *United Transp.
Union v. Burlington N., Inc.*, 470 F.2d 813 (8th Cir. 1972) (*BN1*).
The *BN1* Court concluded that both unions were entitled to
participate but does not indicate that both must be afforded

(continued...)

Perhaps recognizing that the text of the RLA contemplates only two-party board membership, IBEW turns to legislative history and to a line of reasoning that BRS and CSXT contend was raised only on appeal: that the RLA allows only the NRAB to bind a nonconsenting third-party union to arbitration. Both these arguments also fail. The legislative history argument is unhelpful because the RLA clearly and unambiguously states that the public law boards are to be composed of two partisan members and a neutral. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *Kramer v. Banc of Am. Sec. LLC*, 355 F.3d 961, 966 (7th Cir. 2004). The NRAB argument is similarly unhelpful because it imposes a reading on the statute that its text does not bear.

IBEW builds its legislative history argument by quoting a number of passages from the debate surrounding the 1966

---

[2] (...continued)
partisan membership. These cases also involved operating crafts, or those workers who actually operate the trains. In *General Committee of Adjustment v. Burlington Northern, Inc.*, 563 F.2d 1279 (8th Cir. 1977) (*BN2*) and *BLE*, operating craft workers moved between operating positions depending on demand, and the collective bargaining agreements dictated when these moves were possible. An arbitration panel involving a carrier and only one operating union meant that the partisan union could potentially control language in another union's collective bargaining agreement, which in turn might affect an employee's decision about which union to join. In addition, the unions had conflicting interests; employees who moved between positions could not be certain that the partisan union adequately represented their interests. The situation here is notably different. The BRS and IBEW contracts with CSXT share no common language, and BRS is not charged with representing employees covered by IBEW. The result is that the interpretation of BRS's contract has only an indirect effect on IBEW, which can adequately represent its employees' interests by participating as an interested third-party.

amendments to the RLA. H.R. Comm. on Interstate and Foreign Commerce, Railway Labor Act, H.R. Rep. 1114 at 14 (Oct. 1, 1965). Some language in these passages can be read to suggest that all parties with an interest must agree to submit a dispute to arbitration before a board may be convened. But a closer examination of this language in its context reveals that the debate involved certain types of disputes over union jurisdiction. That is, the only language that is arguably helpful to IBEW refers to a situation where one union has attempted to raid the membership of another union with which its jurisdiction overlaps. *See, e.g.*, *S. Pac. Co. v. Switchmen's Union of N. Am.*, 49 Lab. Arb. Rep. 1052 (1967) (Mann, Arb.). Work-assignment disputes, as presented here, are an entirely different issue, and one that Congress did not address in these discussions.

IBEW also asserts that only the NRAB has the power to bind a nonconsenting third-party to an arbitration and ensuing arbitral award. CSXT and BRS contend that IBEW waived this argument by not making it in the district court. The present argument, however, is merely a more fleshed out version of an earlier jurisdictional argument and is therefore properly before this Court. *Bew v. City of Chicago*, 252 F.3d 891, 895-96 (7th Cir. 2001).

Although IBEW's argument is properly before us, it is ultimately unpersuasive. The problem with this argument is that the major purpose of public law boards is to relieve workload pressure on the NRAB. *S. Pac. Co.*, 49 Lab. Arb. Rep. 1052 (writing, in the first public law board convened after the 1966 amendments, that "[a] special adjustment board . . . provides nothing more than an alternative forum for disputes which have heretofore gone to the NRAB, and is intended to alleviate the huge backlog of cases pending before the NRAB"). Public law boards are expressly authorized to resolve "disputes otherwise referable to the [NRAB], or any dispute that has been pending before the [NRAB] for twelve months." 45

U.S.C. § 153 Second. IBEW suggests that, since only the NRAB's procedures are statutorily specified and since the RLA requires parties to notify third-parties of disputes coming before the NRAB, Congress intended only the NRAB to hear disputes involving third-parties. This line of reasoning is thin.

IBEW hinges its argument on a rather complicated reading of § 153 that views each section as self-contained. It argues that since the Supreme Court relied upon § 153 First (j)'s notice provisions to conclude that third-party notice and participation was sufficient to satisfy due process, that provision is necessary to confer jurisdiction. *Transp.—Comm. Employees Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 160 (1966) (*TCEU*). IBEW then argues that the provisions of § 153 First apply *only* to the subparts of § 153 First. As a result, the fact that (j) is housed in § 153 First signifies that it can only apply to the NRAB, which § 153 First establishes. Since § 153 First (j) is limited to the NRAB, the RLA contains no authority that the public law boards may rely on to assert jurisdiction over nonconsenting third-parties. But we find no such limitation in the RLA. *See O'Neill v. Public Law Bd. No. 550*, 581 F.2d 692, 695 (7th Cir. 1978) (concluding that the provisions of § 153 First (j) apply to § 153 Second). Given that the point of the 1966 amendments was to expedite arbitration, it would be illogical to read the RLA in such as way as to preclude (or hinder) parties from taking advantage of the public law boards.

Having concluded that nothing in the RLA itself requires that IBEW participate as a partisan in this arbitration, we finally consider whether the third-party participation structure violates IBEW's due process rights. IBEW contends that the Board denied it crucial participatory rights and therefore fundamental due process when it declined to grant IBEW partisan board member status. CSXT and BRS argue that this Board simply did what has

traditionally satisfied due process: allowed IBEW the opportunity to participate meaningfully as an interested third-party.

In the arbitration context, due process is satisfied so long as the arbitrator provided a fundamentally fair hearing, one that meets the minimal requirements of fairness—adequate notice, a hearing on the evidence and an impartial decision by the arbitrator. *Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997). In work-assignment disputes involving additional interested unions, the Supreme Court has held that due process requires only that the additional union be given "an opportunity to be heard." *TCEU*, 385 U.S. at 165. Here, IBEW admittedly participated in the hearing as an interested third-party. The arbitrator notified IBEW that the dispute before the Board involved decisions implicating IBEW's collective bargaining agreement with CSXT. IBEW submitted its position on the merits to the Board. And no one contends that the arbitrator was anything but impartial.[3]

---

[3]  IBEW's citation to *International Association of Machinists and Aerospace Workers v. Metro-North Commuter Railroad*, 24 F.3d 369 (2d Cir. 1994), is unavailing. The central holding of that short opinion is that a person cannot participate as both an interested party and a decision-maker on an NRAB panel. 24 F.3d at 371-72. Regardless whether that holding is correct, it does not apply to public law boards, since the RLA plainly contemplates that the public law boards will consist of *two* interested party decision-makers and one neutral. The portion of the opinion directly relating to public law boards is notable for its brevity; it provides no discussion of the text of the RLA. Moreover, although the opinion explains that the railroad conducted separate arbitrations for the two unions involved in this dispute, it fails to indicate whether they were able to participate in the arbitrations as interested third-parties. The case's utility here is thus limited.

IBEW's main due process argument is that its relegation to third-party status denied it the opportunity to participate in selecting the neutral arbitrator and in the Board's final deliberations. Many of the articles and cases that IBEW cites suggest that the selection of the neutral in particular is likely to affect the outcome of the arbitration. (Appellant's Br. 13-21 & nn.9-11.) While we have no doubt that choosing a neutral is an important aspect of arbitration, we recognize that railroad arbitration differs fundamentally from ordinary commercial arbitration. Congress promulgated the RLA specifically because disputes involving the transportation infrastructure are different and have the potential to affect all facets of the economy. *See, e.g.*, Leo Kanowitz, *Alternative Dispute Resolution and the Public Interest*, 38 HASTINGS L.J. 239, 288-90 (1987) (discussing arbitration under the RLA). Given that reality, procedures and rules that may be appropriate in ordinary commercial arbitration often are simply unworkable in the context of the railroads.

Moreover, from a practical standpoint, requiring the public law boards to include all interested parties as partisan members promises to eliminate the usefulness of the boards. Not only will their size inevitably increase, but arbitration would likely be delayed by threshold battles over which parties are interested enough to earn seats on the boards. IBEW's position has sympathetic elements; something may seem to be missing when its collective bargaining rights can be affected without its full participation and assent as a board member (although we again note that nothing in the law of due process requires such participation). But the RLA contemplates such a situation, and it protects unions in IBEW's position through third-party participation in the hearing.

Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

                       _____
                       *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*